IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
JULY SESSION, 1998

FILED

September 30, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | No. 01C01-9707-CC-00288 |
| Appellee | ) | |
| | ) | RUTHERFORD COUNTY |
| vs. | ) | |
| | ) | Hon. James K. Clayton, Jr., Judge |
| JOSEPH FREDERICK STINNETT, | ) | |
| | ) | |
| | ) | (Premeditated First Degree Murder) |
| Appellant | ) | |


For the Appellant:

**Gerald I. Melton**
District Public Defender
**Jeffrey S. Burton**
Assistant Public Defender
201 West Main Street, Suite 101
Murfreesboro, TN 37130

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**Deborah A. Tullis**
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493


**William C. Whitesell, Jr.**
District Attorney General
Third Floor, Judicial Building
Murfreesboro, TN 37130


OPINION FILED: _____

AFFIRMED


**David G. Hayes**
Judge

## OPINION

The appellant, Joseph Frederick Stinnett, was found guilty following a bench trial in the Rutherford County Circuit Court of the premeditated first degree murder of Danny Wayne "Red" Phillips and was sentenced to life imprisonment in the Department of Correction. After one day of testimony, the appellant waived his right to a jury trial. In consideration, the State dismissed count two, conspiracy to commit first degree murder, and the pursuit of enhanced punishment. In this appeal, the appellant challenges the sufficiency of the evidence of premeditation and deliberation to elevate the offense to first degree murder.

After a review of the record, we affirm the judgment of conviction entered by the trial court.

## BACKGROUND

In June 1995, Danny Wayne Phillips was found laying face down in a pool of blood in an undeveloped subdivision off Enon Springs Road in Smyrna.

At trial, Dr. Charles Harlan, the forensic pathologist, testified to the presence of multiple lacerations to the head, primarily three distinct areas of laceration to back of the head with a smaller laceration above the others. He noted abrasions to the left side of the forehead, left cheek, left eye, right eye, back, lower left arm, lower portion of the ribs, laceration to the right forehead, and a skull fracture to the back of the head. The abrasions to the chest demonstrated erythema, or reddening, indicating the injuries occurred before death and were consistent with being dragged across a paved surface facedown.

Dr. Harlan determined the cause of death to be blunt trauma to the head from

2

a "coalescence of wounds," taking from a matter of minutes to several hours for death to occur. By examining the multiple injuries to the head, he determined there were "at least seven in number"; however, he testified that it was possible more blows occurred. Multiple blows struck in the same area resulted in compound wounds possibly caused by the butt of a gun, a rock, or a fist using a considerable amount of force. The victim showed no signs of defensive wounds.

Agent Robert McFadden, a forensic scientist with the TBI, testified to the "line of activity" where he discovered shoe tracks, grass samples, "bleed out" areas in the grass and on the asphalt, and a line of blood indicating where the victim had been dragged across the pavement into the weeds. The "line of activity" was "a minimum of over 100 feet" including dragging the victim twenty (20) feet across the asphalt and thirty-four (34) feet into the weeds. Samples taken from the grass, the two large rocks, and rocks from the asphalt were determined to be human blood. Detective Todd Spearman with the Smyrna Police Department testified that from his impressions of the crime scene, more than one person used a rock in commission of the offense.

The ongoing investigation established that the appellant had been last seen in the presence of M.J. Cox, Chad Murphy, the appellant, and his brother John, all of whom were developed as suspects in the murder. Cox and Murphy lived together in LaVergne. Detective Spearman recovered a .380 Lorcin handgun at the home of M.J. Cox. The appellant lived at the Chalet Apartments in Smyrna. The detective located a small gray foreign car belonging to the appellant with numerous blood splatters. Pursuant to a consensual search of the appellant's apartment, officers recovered shoes, clothes, and a suitcase belonging to the victim.

The appellant initially denied any knowledge of the murder. Afterwards, he

voluntarily came forward to make a second statement because, "somebody had done ratted, and I want to tell my story." After advising him of his rights, he made the following statement on June 9, 1995. The appellant stated that he, John, (the appellant's brother), Chad Murphy, and M.J. Cox were visiting a young lady at Lakeside Apartments in Smyrna. When they left, John began talking about "Red" [the victim] owing him money. John stated, "his time was up..." and "we are going to beat him up until he gets the point." On the way to Phillips house in Nashville, the young men bought a case of beer and their "adrenalin was pumping."

After arriving at the victim's home, Murphy went to the door and told Phillips that John and the appellant wanted to speak with them. The victim voluntarily got into the car under the ruse of going to "smoke a joint." The appellant then announced, "I know the perfect spot to go to," a location off Enon Springs Road in Smyrna. Once at the "spot," the four pretended to search the trunk for "weed" and the victim backed against the car while the others circled around him. The appellant gave the signal, and M.J. hit Phillips in the back of the head with the butt of a gun.

Then, the appellant hit the victim in the face two or three times. Immediately, everyone joined in hitting the victim. When the victim yelled, "Let me talk to Joe [appellant], let me talk to Joe," the beating momentarily ceased. The appellant responded, "Red, you had long enough to pay the money that you owe my brother." The victim took off running, and the appellant caught him and brought him back to the car. Again, Phillips ran away and this time Murphy tackled him in the grass. The appellant ran over to the victim and grabbed his waist while John kicked his face and ribs. The appellant moved out of the way and Murphy "started throwing a rock on his head, smashing his head." The appellant checked for a pulse, and the victim was still breathing. John said, "We have to kill him; he will go to the cops if we don't." At this point, Phillips was begging for his life and they stopped beating him again. Thereafter, Murphy hit him a few more times with the rock. M.J. and the

4

appellant dragged him into the tall weeds.  M.J. checked for a pulse and found none.  Then, they all went to the appellant's apartment, showered, threw the bag of bloody clothes into the lake, and, the following morning, washed the car.

Although the appellant's second statement changed nothing from his first statement of a substantive nature, he added,

> "Chad picked up a rock and told me to move out of the way, then I looked up and siad [sic] no, then he siad [sic] move so I moved out of the way and walked to the car to see what John was doing and he was looking for his keys.  Then Chad started pounding Danny's head with the rock over and over.  M.J. and I told him to stop and he siad [sic] no that's what he gets, if he doesn't pay up well and he was laughing while he was pounding his head.  He pounded his head about 20-25 times before he stopped."

Also introduced was a letter referred to as the "Dear Babe" letter in which the appellant wrote to his girlfriend,

> "Don't tell anyone, but I did a lot more to Red than I've siad [sic] I did.  I regret it, but I have to admit it, it kind of felt good just beating his ass because of what he would try to do to you.  But once the brick or rock came in the picture, it wasn't fun any more."

A handwriting expert, Bob Muehlberger, testified in his opinion that both statements and the "Dear Babe" letter were written by the appellant.

The State introduced testimony from the appellant's co-defendant, nineteen year old Chad Murphy, who had previously entered a guilty plea to first degree murder.  Murphy's testimony and the appellant's statements coincided throughout the majority of the trial.  Murphy could not remember whether it was  John or the appellant that suggested they go to Nashville to see the victim.  However, he recalled that both were upset with Phillips because he owed John money and because Phillips had been physically abusive with his wife, the appellant's cousin.  Murphy testified, "we all decided that we was just going to beat him up . . . It just got out of hand."   The evidence demonstrated that only the appellant and his brother knew where Phillips lived.

In addition to the appellant's statement, Murphy stated that the appellant talked to M.J. about making the first move upon his signal, then the four men commenced hitting Phillips. About ten minutes into the attack, Phillips maintained consciousness and was begging for his life. After Murphy had tackled Phillips in the weeds, M.J. tried to snap his neck while the victim was on his knees. Then, the appellant stood behind Phillips with his arm around his neck and tried to choke him. Phillips gave no resistance, but asked the appellant if he could please talk to him. Phillips called out to the appellant because he did not know Murphy or M.J. At this juncture, John Stinnett had returned to the car. Murphy admitted to picking up only one rock and hitting the victim with it. He testified he did not pick up the other rock; but at one point remembered M.J. was attempting to pick up a larger rock and called for assistance from the appellant. However, he never saw anyone else hit the victim with a rock.

Without presenting any proof, the defense rested. The trial court, as the fact-finder, found the appellant guilty of first degree murder after considering all the proof, the evidence, and statements of the appellant to the exclusion of Murphy's prior inconsistent statements[1].

**Sufficiency of the Evidence**

The appellant contends the proof is insufficient to support a verdict of first

---

[1]As recognized by the trial judge and this court pursuant to Rule 613(a), Tenn. R. Evid., Murphy's prior inconsistent statements possessed only impeachment value and could not be used as substantive evidence. The State introduced Murphy's statement from the police video where Murphy stated several times the purpose of going to Nashville was to kill Phillips. "John said he wanted to kill him . . . He said he wanted to go kill this mother . . . Not John's but Joseph's and John's idea. They both knew him. Me and M.J. had never seen him before."

At trial, Murphy said he corrected himself in the statement saying they only went to "beat him up." Murphy's statement revealed further, "we knew if one of us didn't jump in and hit him, that we would die too." The correction Murphy was referring to was, "I didn't have the intent to murder him. I didn't -- let's see, I had the intent to kill him -- I just had the intent to hurt him real bad." Murphy explained that his friends spoke in slang where the word "kill" and "die" do not possess their literal meaning but only to "beat up." Also, Murphy related in his statement, "M.J. -- I mean they hit him with a rock, too . . . M.J. and Joseph."

degree murder. Specifically, he asserts that there is no evidence of premeditation and deliberation. He argues that, at best, the evidence supports a theory of second degree murder "in a heat of passion or a frenzy." The State contends the appellant's leadership role in the killing, the appellant's own statements, and the surrounding circumstances establish the appellant's preconceived intent to kill Danny Wayne Phillips.

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). It is the appellate court's duty to affirm the conviction if the evidence viewed under these standards was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 743 (1995); Tenn. R. App. P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368 (1993).

Once a homicide is established it is presumed to be second degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). First degree murder not committed in the perpetration of a crime requires the "intentional, premeditated and deliberate killing of another." Tenn. Code Ann. §39-13-202(a)(1) (Supp. 1994).[2] Therefore, the State must prove premeditation and deliberation to elevate the offense to first degree murder. Brown, 836 S.W.2d at 543. Premeditation necessitates "the exercise of reflection and judgment," Tenn. Code Ann. § 39-13-201(b) (1991), requiring "a previously formed design or intent to kill." State v. West,

_____

[2]Effective July 1, 1995, deliberation is no longer an element of first degree murder not committed in perpetration of a crime. Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1995). Since this offense occurred around June 7 or 8, 1995, the prior statute requiring deliberation is applicable.

7

844 S.W.2d 144, 147 (Tenn. 1992). Deliberation, on the other hand, is defined as a "cool purpose. . . formed in the absence of passion." Brown, 836 S.W.2d at 538 (citations and internal quotations omitted). Deliberation also requires "some period of reflection, during which the mind is free from the influence of excitement." Id.; see also Tenn. Code Ann. § 39-13-201(b)(2) (*deleted* 1995).

The elements of premeditation and deliberation are questions for the jury and may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993), perm. to appeal denied, (Tenn. 1994). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the appellant's conduct in light of the surrounding circumstances. State v. Wright, No. 01C01-9503-CC-00093 (Tenn. Crim. App. at Nashville, Jan. 5, 1996). Although there is no strict standard governing what constitutes proof of premeditation, several relevant circumstances are helpful, including: the use of a deadly weapon upon an unarmed victim; the fact that the killing was particularly cruel; declaration by the defendant of his intent to kill; and the making of preparations before the killing for the purpose of concealing the crime. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997), cert. denied, --U.S.--, 118 S.Ct. 1536 (1998) (citing Brown, 836 S.W.2d at 541-42). Additional factors from which a jury may infer premeditation include planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing. Gentry, 881 S.W.2d at 4-5 (citation omitted). "Repeated blows can be delivered in the heat of passion, with no design or reflection. Only if such blows are inflicted as the result of premeditation and deliberation can they be said to prove first degree murder." Brown, 836 S.W.2d at 542.

Taken in the light most favorable to the State, the proof introduced at trial established (1) the appellant and his three co-defendants, following their agreed

plan, traveled to Nashville "to beat him [Phillips] up until he gets the point," (2) tricked the victim into going with them, (3) took the victim to an isolated location, (4) the appellant gave the signal to begin the beating, (5) the foursome brutally beat the victim over a period of time, resulting in his death, despite the victim's pleas for mercy and his attempts to escape. From these facts, we conclude that the proof was more than sufficient to support the elements of premeditation and deliberation.

The judgment of conviction is affirmed.

_____
DAVID G. HAYES, Judge

CONCUR:

_____
PAUL G. SUMMERS, Judge

_____
JERRY L. SMITH, Judge