# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

### APRIL 1998 SESSION

FILED

September 9, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

|  |  |
|---|---|
| **STATE OF TENNESSEE,** | ) |
| Appellee, | ) C.C.A. No. 03C01-9709-CR-00376 |
| | ) |
| V. | ) Loudon County |
| | ) |
| **JAMES G. SNIDER,** | ) Honorable E. Eugene Eblen, Judge |
| | ) |
| Appellant. | ) (First Degree Murder) |
| | ) |

FOR THE APPELLANT:

A. Phillip Lomonaco
Attorney at Law
112 Durwood Drive
Knoxville, TN 37922

FOR THE APPELLEE:

John Knox Walkup
Attorney General & Reporter

Todd R. Kelley
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

Charles E. Hawk
District Attorney General

Frank Harvey
Roger Delp
Assistant District Attorneys General
P.O. Box 703
Kingston, TN 37763

OPINION FILED: _____

**AFFIRMED**

**PAUL G. SUMMERS,**
Judge

**O P I N I O N**

In January 1997, James G. Snider was convicted by a Loudon County jury of first degree murder and sentenced to life imprisonment for the May 1995 shooting death of Bradley Packett. The appellant's sole issue for our review is whether the evidence is sufficient to support his conviction for first degree murder. We affirm the judgment of the trial court.

The appellant, James Snider, was seventeen years old at the time he killed Bradley Packett. Snider, whose parents were divorced, had lived at one time or another with his mother, his father, his aunt, and finally with his maternal grandparents in Lenoir City, Tennessee. His grandfather had passed away a few years earlier, so at the time of the shooting, he lived in the house with his grandmother.

Apparently, the appellant had an apartment of his own in the basement of his grandmother's house. It had a separate entrance with a door that would lock. The appellant lived there with his girlfriend, Hollie Key, in the basement apartment. In the months leading up to the shooting, the appellant had attended school sporadically and had increased his use of alcohol and marijuana. Basically, he did as he pleased without any adult supervision. According to testimony adduced at trial, the appellant's grandmother kept marijuana in her home and sold it to the appellant's friends.

The appellant had a party at his apartment approximately two weeks before the shooting. The victim, Bradley Packett, and other friends of the appellant were in attendance, and alcohol and drugs were being used. Hollie Key, the appellant's girlfriend, testified that at some point, a fight ensued between Bradley Packett and another individual who was drunk. This individual

had Packett on the ground when the appellant interceded and broke up the fight. She also testified that the appellant was not angry with Packett.

Dwayne Crass, a friend of the appellant's, testified that he had a conversation with the appellant approximately a month before the shooting and that the appellant had asked when Packett would be home by himself. Jason Mealer, another friend of the appellant's, testified that he stole a shotgun and sold it to the appellant for $75.00 four days before the shooting. He testified that he and the appellant had done some shooting of the gun in the appellant's yard. Mealer also testified that about a week before the shooting, the appellant stated that he was going to go to the victim's house and get the money that was due him.

On the day of the shooting, Johnny Vincil, a friend of the appellant's, arrived at the appellant's apartment between 7 a.m. and 8 a.m. Vincil and the appellant smoked some marijuana. Vincil saw about one-fourth of a pound of marijuana that the appellant had stolen from his grandmother. The appellant's grandmother came downstairs to the apartment and told the appellant that she was kicking him out of the house because he had stolen from her. The appellant then took his girlfriend, Hollie Key, to work, while Vincil stayed at the apartment. The appellant took the marijuana with him when he took Key to work because he did not want his grandmother to find it. When the appellant returned to the apartment, he and Vincil decided to drive around, and then went to a golf ball driving range. Sometime thereafter, when they began looking for the marijuana in the car, it was not there. Vincil testified that he believed that the appellant's grandmother had taken the marijuana out of the car when the appellant returned from taking his girlfriend to work. Vincil and the appellant went inside the house, and the appellant confronted his grandmother, telling her that the marijuana in the car belonged to Vincil. His grandmother told him that she did not care and that "he was gone" anyway.

Vincil and the appellant decided to fabricate a story to tell the appellant's grandmother that someone else had stolen the marijuana. Bradley Packett was suggested because the appellant's grandmother already thought that he was a thief. The appellant went to Packett's house to bring him back, and Vincil went to sleep. Vincil testified that he was not concerned about the appellant confronting the victim.

Susan Brackett, the roommate of the appellant's aunt, testified that on the day of the shooting, the appellant came over to their house and he was very upset. Brackett lives in the same neighborhood as the appellant and Packett. She testified that the appellant was crying uncontrollably and even vomited. He stated that his grandmother was going to kick him out and that he did not have anywhere to go. She further testified that the appellant's aunt, Tina, told him that she would speak with his grandmother. The appellant got into his car to go to his grandmother's, and after taking care of a few things, Brackett and Tina left to go to the grandmother's house. Although it only takes a minute or so to drive there, the appellant was not there when they arrived. After about two or three minutes, the appellant arrived. He had the shotgun in his hand, and stated that he had shot Bradley Packett.

Dr. Sandra Elkins performed an autopsy on the victim. She testified that the back part of the victim's head was no longer intact, with almost the entire brain outside the head. She identified shotgun pellets that were found in the victim's skull and stated that the entrance wound was "in the top part of the back of the roof of the mouth." She further testified that the cause of death was a shotgun blast inside the mouth. On cross-examination, Dr. Elkins testified that this case was atypical of a suicide and a homicide, noting that there were no chipped teeth. She also questioned whether the victim might have voluntarily put the gun in his mouth.

Dr. Diana McCoy, a clinical psychologist, testified about the appellant's social background. She also testified that the appellant stated that when he was at Packett's house, Packett went over to open a window. As he opened the window, the appellant shot him in the back of the head from a distance of about two or four feet. According to Dr. McCoy's testimony, the appellant indicated that he did recall pumping the gun, stepping forward, and then starting to shake.

The appellant argues that the evidence is insufficient to support his conviction for first degree murder. At the time of the shooting, first degree murder was defined as an intentional, premeditated, and deliberate killing of another. The appellant insists that there is no evidence that he acted in a premeditated or deliberate manner. In support of his argument, the appellant notes that all the witnesses who saw him at the time of the shooting testified that shortly before the killing, the appellant was "violently ill from emotional upheaval" to the point of vomiting. Furthermore, after the shooting, the appellant returned , threw the shotgun on the ground, and announced that he had killed Bradley Packett.

The appellant further asserts that even if Bradley Packett was shot through the mouth, "this fact, if true, does not detract from the fact that James Snider was acting in an emotionally charged state. " The appellant maintains that the state offered no proof about how the appellant acted on the day of the murder, and in fact, none of the state's witnesses even saw the appellant on the day of the shooting. Furthermore, he insists that those who saw him that day testified that he was "severely emotional and distraught to the point of physical illness."

The state asserts that the evidence is sufficient to support a conviction for first degree murder. First, it contends that the appellant's prior relationship with the victim could lead a jury to infer a motive for murder: the victim lost a bet to the appellant and then refused to pay. The appellant, according to the state's

theory, had been attempting to collect the money for over a month, but he was unable to get the money from the victim. Second, the state argues that the appellant's actions indicate that he was planning the killing. The appellant questioned friends of the victim about when the victim might be home alone. He bought a shotgun four days before the murder and had been engaging in target practice in his yard. The appellant had been trying to obtain twenty dollars from the victim for a bet that he had won. Third, the state insists that the nature of the killing suggests an intentional killing based on a preconceived design. It argues that the appellant, armed with the shotgun that he had bought four days earlier, went to Bradley Packett's house when the victim was alone, placed the shotgun in Packett's mouth and fired it, thereby causing the victim's death. Therefore, the state insists that a jury could have found that the appellant acted with premeditation and deliberation.

Once a homicide has occurred, it is presumed to be second degree murder, and the state has the burden of proving first degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). At the time of the shooting, first degree murder was defined as "[a]n intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (amended July 1, 1995). A deliberate act is one performed with a cool purpose, and a premeditated act is one done after the exercise of reflection and judgment. Tenn. Code Ann. § 39-13-201(b) (deleted by amendment, July 1, 1995). Premeditation indicates "a previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992).

Great weight is accorded jury verdicts in criminal trials. Jury verdicts accredit the state's witnesses and resolve all evidentiary conflicts in the state's favor. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); State v. Banes, 874 S.W.2d 73, 78 (Tenn. Crim. App. 1993). On appeal, the state is entitled to both the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832 (Tenn. 1978).

Moreover, guilty verdicts remove the presumption of innocence, enjoyed by defendants at trial, and replace it with a presumption of guilt. State v. Grace, 493 S.W.2d 474 (Tenn. 1973). Appellants, therefore, carry the burden of overcoming a presumption of guilt when appealing jury convictions. Id.

When appellants challenge the sufficiency of the evidence, this Court must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979); Tenn. R. App. P. 13(e); State v. Duncan, 698 S.W.2d 63 (Tenn. 1985). The weight and credibility of a witness' testimony are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542 (Tenn. 1984); Byrge v. State, 575 S.W.2d 292 (Tenn. Crim. App. 1978).

From our review of the record, the appellant was reared in an environment that is largely responsible for his problems. It truly does appear as one witness testified that Snider never had a chance to have a decent life. We are troubled not only by the loss of Bradley Packett's life but also by the loss of James Snider's life. The record reveals that these two young lives were destined for tragedy by their use of alcohol and drugs and their lack of adult supervision.

Although the circumstances of this case are tragic for all concerned, we must nevertheless follow the law. The record indicates that the appellant bought a shotgun four days before the shooting and proceeded to engage in target practice. He also made statements to other individuals that he was determined to get the money that Packett owed him from a bet, and the appellant had inquired when Packett might be home alone. Finally, and most significantly, are the autopsy results, as testified to by Dr. Sandra Elkins, that indicate that it is physically impossible for the victim to have been shot in the back of the head as the appellant stated to his psychologist, Dr. Diana McCoy. Dr. Elkins testified

that the cause of death was a gunshot wound to the head, with the entrance wound inside the victim's mouth.  Thus, any rational trier of fact could have found the evidence sufficient to convict the appellant of the intentional, premeditated, and deliberate killing of Bradley Packett.  The evidence is, therefore, sufficient.

We affirm the appellant's conviction and his sentence.

                                _____
                                PAUL G. SUMMERS, Judge

CONCUR:

_____
JERRY L. SMITH, Judge

_____
CURWOOD WITT, Judge